THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BILLY GARRETT COGAR, | ) | CASE NO. 1:24-CV-001404 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Billy Garrett Cogar ("Cogar"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Cogar raises one issue on review of the Administrative Law Judge's ("ALJ") decision, arguing that the ALJ failed to identify substantial evidence supporting the residual functional capacity ("RFC") finding and failed to evaluate the medical opinions, prior administrative medical findings and Cogar's allegations under the appropriate legal standards. This matter is before me pursuant to 42 U.S.C. 405(g), 1383(c)(3) and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Cogar's application for DIB and SSI be affirmed.

## II.      Procedural History

On September 27, 2021, Cogar filed applications for DIB and SSI alleging his disability began April 30, 2021. (Tr. 240-53). The claims were denied initially and on reconsideration. (Tr.

81, 95, 110, 123). On September 12, 2022, he requested a hearing before an ALJ. (Tr. 123).

Cogar, with representation, and a vocational expert ("VE") testified before the ALJ on July 24,

2023. (Tr. 40-69).

On September 28, 2023, the ALJ issued a written decision finding Cogar not disabled.

(Tr. 7-29). The Appeals Council denied his request for review on June 6, 2024, thereby rendering

the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Cogar timely instituted this

action on August 16, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence.

Cogar was 48 years old on the alleged onset date. (Tr. 151). He dropped out of school

after completing the tenth grade. (Tr. 276). He has past relevant work as a construction laborer,

DOT 869.687-026, with an SVP of 2 and a very heavy exertional level; tractor trailer truck

driver, DOT 904.383-010, with an SVP of 4 and a medium exertional level although he actually

performed this job at the heavy level; and display maker, DOT 739.361-010, with an SVP of 7

and a medium exertional level, although he actually performed this job at the heavy level. (Tr.

22-23).

### B.    Relevant Medical Evidence

Records submitted from Avita Ontario Family Medicine show that Cogar first established

care on October 28, 2021. (Tr. 389). At that visit, Cogar described medical issues with his wrists

and hips, described a need to update his medications for Chronic Obstructive Pulmonary Disease

("COPD"), and described symptoms potentially indicative of Post-Traumatic Stress Disorder

("PTSD") and a hernia. (*Id.*). He noted that he had been unable to maintain his commercial

driver's license because of hypertension, and that he could not work a construction job because

2

of pain, tingling and burning in his wrists and arms. (*Id.*). He also reported neck pain and mentioned that he needed a right carpal tunnel release due to his increasing inability to hold objects. (*Id.*). He noted he had been scheduled for release surgery in the past but had to cancel when he lost his health insurance. (*Id.*). He also stopped using COPD medications in 2018 when he lost his insurance, and was smoking 1.5 packs of cigarettes per day. (*Id.*). He was positive for coughing, shortness of breath, and wheezing. (*Id.*). He reported ongoing hip pain, and nightmares relating to truck driving. (*Id.*).

A chest x-ray performed on October 30, 2021, showed no acute cardiopulmonary abnormalities, although there was a five millimeter nodule on the right lower lung that appeared unchanged from an x-ray taken in 2017. (Tr. 375). A cervical x-ray was also performed October 30, 2021, that showed mild degenerative changes resulting in mild osseous narrowing of multiple bilateral foramina. (Tr. 377). A bilateral hip x-ray from the same day showed mild degenerative arthrosis of both hips. (Tr. 379).

On November 12, 2021, Cogar attempted a stress treadmill examination, but could not achieve a maximal heart rate response because of hip pain. (Tr. 438-39). Cogar sought follow-up care for bilateral carpal tunnel syndrome on November 18, 2021, noting that he was experiencing constant numbness that was equally bad in both hands, and he was having trouble performing fine motor skills and was dropping objects. (Tr. 394). He had positive Tinel's and Phalen's tests. (*Id.*). Cogar requested a steroid injection specifically for his left hand. (*Id.*).

At an office visit with his nurse practitioner on November 29, 2021, Cogar noted he received no real relief from the steroid injection to his left hand. (Tr. 430). He also reported receiving no benefit from anxiety medications. (*Id.*). He was scheduled to begin counseling for

PTSD and was continuing to use his rescue inhaler. (*Id.*). He did attend a first counseling session on December 1, 2021. (Tr. 475).

On December 9, 2021, Cogar had a left hip x-ray which showed a slight bilateral pincer deformity predisposing him to possible impingement syndrome. (Tr. 624). Based on the x-ray, his doctor continued him on meloxicam and recommended sacroiliac ("SI") joint injections and physical therapy. (*Id.*). That same day, a lumbar x-ray was also performed, showing minimal degenerative changes of the lower lumbar spine. (Tr. 756).

Given the poor response to the steroid injection in his left hand, on January 20, 2022, Cogar's doctor informed him that release surgery was the only option left to consider. (Tr. 450). Cogar indicated to his doctor that he would prefer to wait to see if he was awarded disability benefits before he consented to the surgery, so he was scheduled for a re-evaluation in two months. (*Id.*). At an office visit on January 27, 2022, Cogar noted he had experienced 50% improvement of his hip pain from bilateral SI joint injections. (Tr. 608). He was treating his neck pain with home exercises and medications. (*Id.*). On February 6, 2022, Cogar submitted to a Pulmonary Function Test ("PFT") which revealed a mild obstruction. (Tr. 458-61). At a February 14, 2022, office visit with his orthopedist, Cogar was recommended to continue conservative treatment for low back and hip related symptoms. (Tr. 606).

On March 7, 2022, Cogar's counselor diagnosed him with Bipolar I Disorder, generalized anxiety disorder, PTSD, grief, and cigarette nicotine dependence. (Tr. 492). It was determined that he would continue with cognitive behavioral therapy and try to work through his trauma and grief. (Tr. 494).

Cogar met with a physician's assistant on March 22, 2022. (Tr. 507). Cogar expressed that he was not finding any relief from his left-hand injections, and he was experiencing

significant numbness, tingling and pain in his hands. (*Id.*). Cogar was again informed that the only treatment option remaining was release surgery, and he determined that he wanted to consider that option and would decide at a follow-up appointment in a month if he wished to pursue surgery. (Tr. 508). He began physical therapy for his neck pain, and was discharged from therapy on May 18, 2022, having partially achieved his goals, and with a home exercise program. (Tr. 566).

On June 23, 2022, Cogar underwent a right carpal tunnel release. (Tr. 540-41). At an office visit two weeks after the release was performed Cogar reported he was doing well. (Tr. 881). He reported no complaints and said that the numbness and tingling had resolved. (*Id.*). He stated that he would likely have a left-hand release in the future and would call when he was ready to schedule it. (*Id.*).

A PFT performed on September 22, 2022, again showed a mild obstruction with peripheral air trapping. (Tr. 795). There was mild to borderline response to bronchodilator during the test. (*Id.*). Cogar also underwent a chest CT that same day which showed COPD from smoking with mild upper lobe emphysema and central bronchial airway thickening. (Tr. 731). There was a likely benign tiny right upper lobe lung nodule. (*Id.*). On October 4, 2022, Cogar was assessed with asthma-COPD overlay syndrome, lung nodule, nicotine dependence, secondary pulmonary arterial hypertension, pulmonary emphysema – unspecified emphysema type, and interstitial lung disease. (Tr. 730).

At a pain management office visit on November 4, 2022, Cogar was observed to have moderate difficulty transitioning from sitting to standing and an antalgic gait. (Tr. 705). Palpation revealed tenderness over the bilateral sacral spine, and the range of motion was

limited. (*Id.*). He was assessed with chronic SI joint pain and was given bilateral SI joint injections. (*Id.*).

At a December 2, 2022 office visit Cogar told an LPN he had taken himself off most of his medications because he did not feel they were effective. (Tr. 674). He described his anxiety as "full blown." (*Id.*). He had been receiving injections for myofascial thoracic pain but had not found them helpful. (Tr. 675). He was observed to have trouble straightening up from sitting to standing, and in ambulating to the exam table. (Tr. 676).

On March 3, 2023, Cogar attended an office visit where he was noted to have wheezing, shortness of breath and coughing with exertion. (Tr. 664). He requested refills on gabapentin which provided some relief for back pain, and he noted his sleep medication had been helping. (Tr. 665). He had quit smoking and drinking coffee, and was assessed with COPD, chronic bilateral lower back pain with sciatica, insomnia, myofascial pain syndrome of the thoracic spine, and PTSD. (Tr. 666-67).

### C. Medical Opinion Evidence

#### i. State Agency Reviewers

On February 25, 2022, state agency reviewing psychologist Jennifer Swain, Psy.D., opined Cogar had a mild limitation in understanding, remembering, and carrying out instructions and moderate limitations in the domains of concentration, persistence, and maintaining pace; interacting with others; and adaptation. (Tr. 74). She noted moderate limitations in maintaining attention and concentration for extended periods; in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in his ability to accept instructions and respond appropriately to criticism from supervisors; in his ability to get

along with coworkers and peers without distracting them or exhibiting behavioral extremes; in his ability to respond appropriately to changes in the work setting; and in his ability to set realistic goals or make plans independently of others. (Tr. 78-79). On August 1, 2022, state agency reviewing psychologist Vicki Warren, Ph.D., confirmed Dr. Swain's opinion. (Tr. 102).

On May 2, 2022, state agency reviewing physician Gary Hinzman, M.D. determined that Cogar could lift/carry 20 pounds occasionally and 10 pounds frequently, consistent with a light exertional level. (Tr. 76). He was limited to six hours of sitting, standing, or walking during an eight-hour workday. (*Id.*)*.* He could occasionally climb ladders, ropes, or scaffolds. (Tr. 77). He was limited in reaching overhead bilaterally and limited to frequent handling and fingering bilaterally. (*Id.*). He needed to avoid concentrated exposure to fumes, odors, dusts, and gases. (Tr. 77-78). He needed to avoid all exposure to heavy moving machinery or unprotected heights. (*Id.*). On August 9, 2022, state agency reviewing physician Mehr Siddiqui, M.D., confirmed Dr. Hinzman's opinion. (Tr. 117-20).

### ii.        Consultative Examination Reports

On February 17, 2022, Cogar attended a consultative examination with Curtis Ickes, Ph.D. (Tr. 465-69). Cogar reported that he had been divorced since 2010, and that he had three grown children from that marriage. (Tr. 465-66). He was residing with his cousin. (Tr. 466). He had dropped out of school during tenth grade but did attend vocational training at truck driving school. (*Id.*). He had last been employed as a truck driver in 2020 but could no longer perform that job because he cannot concentrate. (*Id.*). He claimed he was no longer able to work because of back pain and breathing problems. (*Id.*).

When asked about his behavioral health history he noted witnessing significant traumatic events that included deaths, accidents, and robberies. (*Id.*). He reported having nightmares every

day about those incidents and reported that he "space[s] out all day long." (*Id.*). He also reported

being depressed for 20 years, with symptoms including isolation, crying spells, and poor sleep

and appetite. (Tr. 466-67). He reported treating with medication and counseling but did not seem

to find either helpful. (*Id.*). His affect appeared depressed, and he appeared to be on the verge of

tears at times. (Tr. 467). He reported symptoms consistent with PTSD including flashbacks,

nightmares, and some fine motor tremors. (*Id.*). His intellectual functioning was estimated as low

average. (Tr. 468).

Based on the examination, Dr. Ickes diagnosed Cogar with PTSD and Major Depressive

Disorder, Recurrent Episode, Moderate. (*Id.*). Dr. Ickes opined that Cogar could understand,

carry out, and remember both one-step and complex instructions. (Tr. 469). Cogar could

concentrate and persist in routine and non-speeded activities but would have difficulties with

complex and/or speeded work activities due to his anxiety and depression. (*Id.*). Jobs requiring

ongoing interactions with other could be problematic. (*Id.*). He might have problems dealing

with the stress of speeded or changing tasks, and/or tasks that require frequent decision-making.

(*Id.*).

On April 1, 2022, Cogar attended a consultative examination with Parker Guinsler, D.O.

(Tr. 516-19). He noted a past medical history that included tobacco abuse disorder, THC use

disorder, COPD, degenerative disc disease, PTSD, and major depressive disorder. (Tr. 516). He

noted that he has smoked 1.5 packs of cigarettes per day for 35 years and that he becomes short

of breath on exertion. (*Id.*). He is able to walk through a grocery store but has significant

difficulty doing yard work and chores around the house. (*Id.*). Cogar reported a lack of energy

and low motivation which he attributed to his mental health issues. (*Id.*). He has had lower back

discomfort for several years due to working as a truck driver. (*Id.*). He reported constant, chronic

sacroiliac joint discomfort that he treats with Mobic and Zanaflex, and he has had injections that were only minimally effective. (*Id.*). Dr. Guinsler noted a mildly antalgic gait and a straight leg raise test positive on the right for lower back discomfort. (Tr. 518). There was a mild range of motion deficit within the cervical spine and the thoracolumbar region. (*Id.*). He had mild fine fingering deficits, right worse than left with some dexterity limitations. (*Id.*). His grip strength was 4/5 bilaterally. (*Id.*).

Dr. Guinsler opined that, given only mild strength deficits, Cogar had only minimal limitations. (*Id.*). He could walk about two to three hours of an eight-hour day and be on his feet three to four hours of his workday; he could carry 10-15 pounds frequently and 15-20 pounds occasionally; he would have mild limitation with lifting, carrying, pushing, pulling, crawling, kneeling, crouching, climbing, stooping, and bending; and handling, gripping, fingering, and feeling were moderately reduced secondary to his carpal tunnel syndrome. (*Id.*).

### D.    Administrative Hearing Evidence

On July 24, 2023, Cogar testified before the ALJ that he was living with his cousin. (Tr. 46). Although he had a driver's license, he rarely drove. (*Id.*). He quit school in the tenth grade. (*Id.*). He reported that his last job was working for a contractor, "slamming in drywall and tearing apart houses and trying to carry shingles." (Tr. 47). Prior to that job he had largely worked as a truck driver for several employers. (Tr. 47-51). He had also worked at a factory building displays for big box stores such as Home Depot, Lowe's, or Sears. (Tr. 49).

Cogar testified that he found it difficult to perform any work that required him to stand on concrete, and he has trouble bending over to pick anything up. (Tr. 51). He stated he cannot learn new technology because he has panic attacks if he has to sit in a classroom with other people. (Tr. 52). He has mostly quit smoking, and he still uses a rescue inhaler if he has to go outside.

(Tr. 52-53). He used to use a nebulizer until his was destroyed in a house fire. (Tr. 53). He has pain in his lower back and injections have not provided much relief. (Tr. 54). He finds gabapentin helpful. (*Id.*). He used to be an active person, but he does not believe he is even "60% of what [he] used to be." (Tr. 54-55). A year after his right carpal tunnel release surgery, the carpal tunnel returned in his right hand, and remains bad in his left hand. (Tr. 56). His hands hurt and tend to "cripple up." (*Id.*).

Cogar testified to experiencing trauma both in his childhood and while working as a truck driver. (Tr. 57). He was experiencing anxiety attacks in his final year as a truck driver. (Tr. 57-58). He had found mental health medications were not helpful and he chose to stop taking them in December 2022, but recently started taking a new medication. (Tr. 58). He spends his time working on puzzles, doing laundry, straightening up his house, and talking to his children on the telephone. (Tr. 58-59).

Upon questioning by his lawyer, Cogar noted that while his right hand is a little better than his left, he still experiences pain and numbness in both hands. (Tr. 60). He tends to drop things, such as his coffee cups, and he does not believe he can handle and finger for six hours out of an eight-hour workday. (*Id.*). He does not believe he can stand long enough to work, particularly on concrete surfaces, and if he did try to do so he would be unable to do it again the next day. (*Id.*).

Following Cogar's testimony VE Brett Salkin testified. He labeled Cogar's past work as a construction laborer, DOT 869.687-026, SVP 2, classified and performed at the very heavy exertional level; tractor/trailer truck driver, DOT 904.383-010, SVP 4, classified at the medium exertional level, but performed at very heavy; and display maker, DOT 739.361-010, SVP 7, classified at the medium exertional level, and performed at very heavy. (Tr. 62-63).

For her first hypothetical, the ALJ asked the VE to consider an individual capable of performing light work in that they could lift/carry twenty pounds occasionally and ten pounds frequently but would be limited to standing and walking for four hours of an eight-hour workday; could occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; could frequently reach overhead; could frequently handle and finger with the left upper extremity; could have occasional but not concentrated exposure to temperature extremes, weather, humidity or atmospheric condition as rated and defined in the selective characteristics of occupations; could never climb ladders, ropes or scaffolds, or work around hazards such as moving mechanical parts or unprotected heights; could occasionally engage in occupational driving; could perform detailed but not complex tasks without a production rate pace; could occasionally interact with co-workers and supervisors, but work duties should not require teamwork or tandem work and should not require interaction with the public; and could adapt to occasional changes. (Tr. 63-64). The VE opined that such an individual could not perform Cogar's past work but would be able to perform jobs such as a price marker, DOT 209.687-034, SVP 2, light, with 90,000 jobs in the national economy; mail clerk, DOT 209.687-026, SVP 2, light, with 40,000 jobs in the national economy; and copy machine operator, DOT 207.685-014, SVP 2, light, with 9,000 jobs in the national economy. (Tr. 64).

For her second hypothetical, the ALJ asked the VE to consider an individual with all the same characteristics as the first individual, except that this individual would be limited to two hours standing and walking during an eight-hour workday rather than four. (Tr. 65). The VE opined that this individual could perform the following sedentary exertional level jobs: document preparer, DOT 249.587-018, SVP 2, with 17,000 jobs in the national economy; table worker,

DOT 739.687-182, SVP 2, with 8,200 jobs in the national economy; and film touch-up screener, DOT 726.684-110, SVP 2, with 2,900 jobs in the national economy. (*Id.*).

For her next hypotheticals, the ALJ asked the VE to consider the same individuals from the first two hypotheticals, but each would be limited to frequent handling and fingering with the right upper extremity and occasionally handling and fingering with he left upper extremity. (Tr. 65-66). The VE opined that these limitations would be job prohibitive at both the light and sedentary levels. (Tr. 66). The VE further noted that there would be no transferable skills from any of Cogar's past jobs. (Tr. 65). The VE also noted that for those issues raised in the hypotheticals that were not specifically contemplated in the DOT he relied on his training and experience in job placement and retention for his opinion. (Tr. 66). Finally, Cogar's attorney asked whether limiting the individual in the ALJ's first hypothetical to three hours standing and walking would reduce the exertional level to sedentary. (*Id.*). The VE opined that it would. (*Id.*).

## IV.     The ALJ's Decision

In her decision dated September 28, 2023, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2.     The claimant has not engaged in substantial gainful activity from April 30, 2021, the alleged onset date. (20 CFR 404.1571 *et seq*. and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD); emphysema; asthma; bilateral hip osteoarthritis; left carpal tunnel syndrome; post-traumatic stress disorder (PTSD); depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as

defined in 20 CFR 404.1567(b) and 416.967(b), as follows: he could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and walk four out of 8 hours; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; frequently reach overhead; frequently handle and finger with the left upper extremity; sustain occasional but not concentrated exposure to temperature extremes, weather, humidity, and atmospheric conditions as those are rated and defined in the SCO; never climb ladders, ropes or scaffolds or work around hazards such as exposure to moving mechanical parts or unprotected heights, and occasionally engage in occupational driving. The claimant can perform detailed but not complex tasks without a production rate pace and interact occasionally with co-workers and supervisors, but work duties should not require teamwork, tandem work, or interaction with the public. The claimant can adapt to occasional changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 16, 1972, and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-40).

## V.        Law and Analysis

### A.        Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and thus entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.        Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S.

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

15

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Although written as a single issue in his Brief on the Merits, Cogar raises three distinct issues for this Court's review:

1.    Did the ALJ find substantial evidence in support of the residual functional capacity finding?

2.    Did the ALJ evaluate the medical opinions and prior administrative medical findings ("PAMF's") pursuant to the proper legal standard?

3.    Did the ALJ evaluate Cogar's subjective allegations pursuant to the proper legal standard?

### A.    The ALJ's RFC was supported by substantial evidence.

Cogar's first argument questions whether the ALJ cited substantial evidence in support of the RFC. Specifically, Cogar cites to evidence in the record that he suggests is contrary to the ALJ's RFC regarding his pulmonary issues, his hip, lower back and cervical pain, and his mental health, and suggests that the evidence justifies a sedentary RFC. (ECF Doc. 8, pp. 15-25). The Commissioner responds that Cogar's claim that the ALJ did a "selective reading of the record" is tantamount to an invitation to reweigh the evidence, an exercise inappropriate for this Court. (ECF Doc. 10, p. 10).

My review of the ALJ's decision is "limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Napier v. Comm'r of Soc. Sec.* 127 F.4th 1000, 1004 (6th Cir. 2025), citing *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "more than a scintilla of evidence but less than a preponderance," *id.*; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). As long as the

16

ALJ's findings are supported by substantial evidence, we may not second-guess them, even if substantial evidence would support the opposite conclusion. *Ulman v. Comm'r of Soc. Sec.*, 693, F.3d 709, 714 (6th Cir. 2012).

The ALJ noted that Cogar had raised several physical and mental health symptoms that he claimed impaired his ability to work. (Tr. 17). These included difficulty breathing, limited concentration, hip, and low back pain, hand and wrist pain, and repeated anxiety attacks. (*Id.*). The ALJ proceeded to address the evidence of each symptom that advised her RFC determination. As for his breathing, the ALJ noted that Cogar reported smoking 1.5 packs of cigarettes daily. (*Id.*). She also noted an examination in October 2021 where he displayed decreased air movement and wheezing, but no decreased breath sounds, and a chest x-ray at that time showed no acute cardiopulmonary abnormality. (*Id.*). The ALJ referred to a PFT performed in early 2022 that showed only a mild obstruction, and a chest CT completed in August 2022 that showed no acute abnormality, mild emphysematous disease, and a tiny pulmonary nodule. (Tr. 18). Follow up notes showed that medications were improving Cogar's breathing. (*Id.*).

Similarly, the ALJ evaluated the evidence related to his hip and lower back pain. An x-ray revealed mild degenerative arthrosis of both hips, but otherwise no acute abnormality. (*Id.*). Lumbar spine imaging showed minimal degenerative changes of the lower lumbar spine. (*Id.*). Examinations were positive for tenderness and decreased range of motion in the bilateral hips and SI joint provocative tests were mildly positive bilaterally. (*Id.*). Cogar relieved 50% of his hip pain with injections, and treatment notes indicate improvement with a medication regimen including gabapentin and baclofen. (*Id.*).

The ALJ's decision also considered the evidence concerning Cogar's hand and wrist pain, noting a history of numbness, tingling, and burning in his hands. (*Id.*). Examination had

shown bilateral wrist bony tenderness, decreased range of motion, decreased strength in both hands, and decreased sensation in the right. He had positive Tinel's and Phalen's tests bilaterally. (*Id.*). She also noted that the symptoms in his right hand were completely resolved by release surgery, rendering his right carpal tunnel syndrome non-severe. (*Id.*). The ALJ noted only mild findings in the neck and mid-back, with reports of resolved pain; negative imaging of his lower with mild findings in the hips; some SI tenderness, but normal sensation and typically normal reflexes; mild COPD and emphysema with mixed physical examination findings on his respiratory status with normal oxygen saturations on room air. (Tr. 18-19). These findings rise well beyond the substantial evidence standard established in *Biestek*, and adequately account for the limitations defined in the RFC.

As to mental health, the ALJ again thoroughly considered the evidence in the record and explained the basis of the RFC's restrictions. The ALJ noted that Cogar reported he stopped working as a truck driver because of anxiety, but that he first presented with mental health symptoms in October 2021. (Tr. 19). The ALJ noted he was prescribed medication and referred for psychiatric treatment but chose to discontinue both after a relatively brief period. (*Id.*). The ALJ wrote that Cogar's symptoms varied when seeing mental health professionals, whose notes described him with anxious mood, flat to angry affect, irritable but cooperative behavior, restlessness, and tension, and normal cognition despite complaints of memory issues. (*Id.*). In March 2023 he presented as inattentive and anxious with normal affect, speech, behavior, thought content, cognition, memory, and judgment. (*Id.*). The ALJ also noted that Cogar "did not require routine emergent treatment for acute mental symptom exacerbations, nor did he require hospitalizations for periods of mental instability. (Tr. 20).

It is clear the ALJ gave thoughtful consideration to the evidence in the record before arriving at Cogar's RFC. The ALJ provided substantial evidence to support the limitations imposed by the RFC, and considered the medical evidence, as well as the medical opinions, as explained below. While Cogar does provide examples of evidence that could lead to an alternate RFC, I concur with the Commissioner's argument that consideration of these examples amounts to an invitation to reweigh the evidence, and such second-guessing is beyond this Court's purview. Accordingly, I do not recommend remand on this basis.

### B.    The ALJ applied the proper standard when evaluating medical opinions and prior administrative medical findings.

Cogar argues that the ALJ "failed to apply the regulatory factors to the consultative examinations and PAMFs. The ALJ did not credit the opinions, and, instead, assessed limitations based on her own lay opinions." (ECF Doc. 8.  p. 14). He also contends the ALJ "did not address whether the opinions were consistent with or supported by the record, instead offering only conclusory declarations." (*Id.*, quoting *Angela R. v. Comm'r of Soc. Sec.*, 2022 WL 2167545, at *7 (S.D. Ohio June 16, 2022), *report and recommendation adopted,* No. 2:20-CV-6322, 2022 WL 2486980 (S.D. Ohio July 6, 2022)). As for expert opinions concerning Cogar's physical functioning, Cogar suggests the ALJ failed to explain how the PAMF opinions were supported and what evidence conflicts with the PAMFs. (ECF Doc. 8, p. 15), while also failing to apply the consistency factors to the opinions of the consultative examiner. (*Id.* at p. 17). As to mental functioning expert opinions, Cogar argues the ALJ "failed to provide factually supported and legally valid reasons for rejecting certain limitations and failed to provide any rationale for excluding certain limitations[.]" (*Id.*).

The Commissioner responds, with regard to the opinions and PAMFs pertaining to physical functioning, that the ALJ "properly evaluated these prior administrative findings with

19

reference to both supportability and consistency." (ECF Doc. 10, p. 9) The Commissioner notes

that the ALJ can consider all the evidence without directly addressing each piece of evidence in

the written decision, and stresses that the ALJ's RFC included greater limitations than those

found in the PAMFs in light of her review of the larger record. (*Id.* at p. 10). The Commissioner

also contends the ALJ, when considering the opinion of the consultative examiner, clearly

articulated her consideration of that opinion with reference to the larger record, even if she did

not specifically use the word "consistency." (*Id.* at p. 11). As to the opinions concerning Cogar's

mental function, the Commissioner writes, "the ALJ reasonably explained her departures from

the findings of the state agency medical consultants despite her conclusion that they were

generally persuasive. (*Id.* at p. 14).

 The Commissioner has the better of this argument. An RFC determination is a legal

finding, not a medical determination. Thus, an "ALJ – not a physician – ultimately determines a

claimant's RFC." *Peirce v. Saul*, No. 3:20-CV-0248, 2021 WL 606369, at *6 (N.D. Ohio Jan.

25, 2021), quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F.App'x 435, 439 (6th Cir. 2010) citing

42 U.S.C 423(d)(5)(B); see also *Nejat,* 359 F.App'x at 578. ("Although physicians opine on a

claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work

determinations belongs to the Commissioner."); 20 C.F.R. 404-1546(c)("[T]he administrative

law judge . . . is responsible for assessing your residual functional capacity.").

 The ALJ must "articulate how [she] considered the medical opinions" and "how

persuasive [she] find(s) all of the medical opinions." 20 C.F.R 416.920c, *see Gamble v.

Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, *5 (N.D Ohio, Feb. 28, 2018). Factors to be

considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant,

including length of treatment relationship, frequency of examinations, purpose of the treatment

relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. 416.920c.

The ALJ made clear how she evaluated the expert opinions, giving consideration to the factors of supportability and consistency. She found the state agency medical consultant's opinions "persuasive in general, as they are generally well supported by reference to the record at the time they were provided. However, they are not entirely consistent with the collateral file, and I have therefore departed somewhat from their findings." (Tr. 20). This articulates that the ALJ considered the consistency of the opinion with the evidence in the complete record, both as it existed at the time the opinions were rendered, and after. Further, the ALJ contemplated supportability. She imposed a greater limitation on walking/standing than the experts recommended due to the reports of shortness of breath and hip pain, but noted the very mild findings of hip arthritis and COPD did not support limiting sitting; she imposed no limitations on handling and fingering with the right upper extremity, unlike the experts, given indications in the record that right wrist symptoms resolved with surgery; and she "limited environmental factors more broadly than the State agency" and "added or reduced other postural limitations" based on findings on the record. (*Id.*). A subsequent reviewer can have no question about the ALJ's reasoning given her clear discussion of the factors of consistency and supportability.

Similarly, in evaluating the opinions of the State agency psychological consultants, the ALJ noted that the opinions were "persuasive insofar as the consultants found him limited to a moderate degree and adopted limits on complexity, pace, social interaction, and adaptation." (Tr. 21). While noting that she could not adopt findings of the experts that were "not phrased in

policy compliant terms", the ALJ did include restrictions in her RFC that were similar to those from the expert opinion. She chose, however, not to adopt social limitations based on his professed ability to be cooperative even when he is irritable. (*Id.*).

The ALJ also evaluated the opinions of both a psychological and a medical consultative examiner, (Tr. 21-22), finding the opinion of the psychological consultative examiner "persuasive in part" and adopting "most of the findings of [the medical] examiner's report, and it is persuasive to that extent". (*Id.*). In assessing those opinions, the ALJ specifically noted areas where the opinions lack support, such as the psychological examiner's assessment of Cogar's social limitation, or the medical examiner evaluation of Cogar's manipulative abilities, or his stamina for walking and standing. (*Id.*). The ALJ also notes areas where the consultative examiner's opinions were consistent with the record, such as in his interactions with mental health providers and in his limitation to a light exertional level. (*Id.*).

The ALJ's duty is to explain the weight given to expert medical opinions and ensure that a subsequent reviewer can follow the ALJ's reasoning. The ALJ must specifically address the critical factors of supportability and consistency and articulate how each was considered. In her decision, the ALJ here explicitly and meticulously met her burden, and left no doubt about how she arrived at her conclusions about the persuasiveness of the experts. Accordingly, I cannot recommend remand on this basis.

### C.    The ALJ evaluated Cogar's subjective allegations under the proper legal standard.

Cogar argues that the ALJ disregarded his subjective claims relating to his work history and decline in health without identifying objective findings or valid reasons for doing so. (ECF Doc. 8, pp. 20-21). The Commissioner responds by contending that Cogar did not specifically identify any issues with the ALJ's analysis of his subjective complaints, rather he merely

provided his own summary of evidence and testimony and suggests there is support for a greater level of limitation. (ECF Doc. 10, p. 12). The Commissioner argues the ALJ specifically found that Cogar's subjective complaints were not "entirely consistent with the medical and other evidence in the record," (*id.*) while noting the benefits he received from medication and other treatments and his activities of daily living. (*Id.* at p. 13).

When assessing a claimant's subjective statements, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Grames v. Comm'r of Soc. Sec.*, 815 F. App'x 820, 825 (6th Cir. 2019), quoting *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011); *see also* SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Next, the ALJ must consider the objective medical evidence and the claimant's reported daily activities, as well as several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1)-(3); SSR 16-3p, 2017 WL 5180304, at *4, *7-8 (Oct. 25, 2017). The ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged pain. If there is, the ALJ considers all the evidence to determine the extent to which the pain affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* 2022 WL 19334605, *3 (6th Cir., December 8, 2022), citing 20 C.F.R. § 416.929 (a)-(c). The review here must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* 2023 WL 2523304, *2 (6th Cir., Mar. 15, 2023). Cogar's argument does not overcome this deferential standard of review.

The ALJ here found that Cogar's medically determinable impairments of COPD, emphysema, asthma, bilateral hip osteoarthritis, left carpal tunnel syndrome, PTSD, depression, and anxiety could reasonably be expected to cause at least some of his alleged symptoms. (Tr. 17). However, the ALJ determined that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*). The ALJ further wrote that Cogar's statements were "inconsistent because they are not supported by the objective evidence of record, and while his conditions pose some limitations, they do not preclude the limited range of work described herein." (*Id.*).

In examining Cogar's subjective assertions the ALJ noted they were not consistent with the objective medical evidence. (Tr. 18). The ALJ wrote that the record showed only mild findings in his neck and mid-back, as well as reports of resolved pain. (Tr. 18-19). The ALJ discussed negative imaging of his lower back, although there were mild findings, including some tenderness and limited range of motion in the hips. (Tr. 19). Although there were reports of SI tenderness, the hips were typically normal or hyper reflexive. (*Id.*). The ALJ wrote that Cogar had been assessed with mild COPD and emphysema, having noted early mild findings on chest x-rays, pulmonary function testing, and a chest CT, and noted typically normal oxygen saturations on room air. (Tr. 17, 19). The ALJ wrote of generally successful treatment for both respiratory issues and carpal tunnel syndrome. (Tr. 19).

The ALJ further noted inconsistencies within Cogar's subjective statements, as he described himself in a December 2021 treatment note as a "very active individual" then later testified that he had not been active since he had stopped working. (*Id.*). The ALJ also noted the inconsistency between performing work at a very heavy exertional level for seven months

immediately preceding his claim to be incapable of even sedentary work, writing "[a]bsent and acute injury or intervening factor, with the types of progressive problems the claimant's record reveal, one would not expect such a precipitous decline in abilities." (*Id.*). Accordingly, the ALJ determined "[c]onsidering the evidence as a whole, the claimant's subjective statements are not sufficiently consistent with the collateral record to warrant greater limitations than those adopted herein." (*Id.*).

As for Cogar's subjective mental health allegations, the ALJ noted an inconsistency between Cogar's report that he stopped working as a truck driver in 2020 due to anxiety and his initial report of anxiety to a medical professional in October 2021. (*Id.*). The ALJ wrote that during the relatively brief period of time Cogar received mental health treatment his "mental status findings varied as he presented with anxious mood, flat to angry affect, irritable but cooperative behavior, restlessness, and tension, but also normal cognition despite complaints of memory issues. (*Id.*). The ALJ also considered that Cogar had not received any routine emergent treatment for acute mental health symptoms, and he was not hospitalized because of mental instability. (*Id.*).

After reviewing the record, including the objective evidence and the medical opinions, the ALJ determined that:

> while the claimant has medically determinable impairment that could reasonably cause some symptoms and limitations . . . the claimant's testimony regarding the extent of such symptoms and limitations is not fully supported. However, the claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent they are consistent with the evidence as a whole. Nevertheless, in considering the criteria enumerated in the Regulations, Ruling and case law for evaluating the claimant's subjective complaints, the claimant's testimony was not persuasive to establish an inability to perform the range of work assessed herein. The location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the above residual functional capacity.

(Tr. 22).

The ALJ carefully considered Cogar's subjective complaints and assessed those allegations in the context of the medical findings and opinions in the record. There is substantial evidence supporting the ALJ's evaluation of the subjective allegations, and no indication that the ALJ failed to abide by the law. While Cogar has cited evidence in the record he feels is contradictory to the ALJ's finding, this amounts to an invitation to re-weigh the evidence, and such an invitation must be declined as beyond this court's purview. Accordingly, I cannot recommend remand on this issue.

**VII.**     **Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Cogar's applications for DIB and SSI be affirmed.

Dated: March 14, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019).